## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**EDWARD RATLIFF,**

> **Plaintiff,**

> **v.**                                        **CASE NO.: 1:22-cv-00156-AW-MAF**

**CITY OF GAINESVILLE,**

> **Defendant.**

_____/

### DEFENDANT'S CASE DISPOSITIVE MOTION FOR SUMMARY
### JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Defendant CITY OF GAINESVILLE ("City") moves for summary judgment

against Plaintiff EDWARD RATLIFF as to his claims alleging disparate treatment

race discrimination, retaliation, and hostile work environment in violation of 42

U.S.C. § 1981, as pled through 42 U.S.C. § 1983.[1]

## I.    STATEMENT OF FACTS

### A.    Ratliff's First Assignment to the K-9 Unit.

Ratliff began employment with the Gainesville Police Department ("GPD")

in 2008. ECF 19-1, 46:16–20. In April 2015, Ratliff was selected to be in GPD's K-

9 Unit. *Id.*, 52:7–12, 59:15–25. He was instructed to keep his personal dog, which

---

[1] Count III, which alleges a violation of Section 440.205 of the Florida Statutes, has been severed and remanded to state court. ECF 16.

was known to be "dog aggressive," and his GPD K-9 separated. ECF 19-2. Despite this directive, the two dogs fought at Ratliff's residence in June 2015, resulting in a serious injury to GPD's K-9. ECF 19-1, 68:3–15, 23–25. Ratliff was removed from the K-9 Unit in July 2015 due to performance issues. *Id.*, 77:2–4; ECF 19-3; ECF 19-4, p. 1; ECF 19-5, ¶ 5; ECF 19-6, ¶ 5; ECF 19-7, ¶ 10.

  B. <u>Ratliff's Return to the K-9 Unit.</u>

  In April 2017, at the encouragement of Corporal Jeff Kerkau and Sergeant Charles Owens, Ratliff applied to and was selected for the K-9 Unit. ECF 19-1, 95:13–16, 96:13–20; ECF 19-4, p. 1; ECF 19-8, ¶¶ 6–7. Ratliff was chosen over two Caucasian officers. ECF 19-1, 98:3–20.

  In May 2018, Ratliff was placed on a performance improvement plan ("PIP") because his deficiencies with handling his K-9, Ace, resulted in a degradation in Ace's demeanor and behavior. *Id.*, 104:17–105:11; ECF 19-9; ECF 19-5, ¶ 8; ECF 19-6, ¶ 15. Ratliff and Ace were assigned to remedial training to improve their performance. ECF 19-1, 105:12–14; ECF 19-9.

  Ratliff and Ace improved during remedial training, successfully completed the PIP, and Ratliff remained in the K-9 Unit. ECF 19-1, 109:15–25. However, even after completing the PIP, Ratliff was unable to maintain Ace at GPD standards. ECF 19-4, p. 2. Sergeant Owens opined that Ace's problems were "a direct reflection of Ratliff" and that Ratliff's "actions had negative effects on Ace's behavior." *Id.*, p. 3.

2

Although Sergeant Owens was concerned about Ace's performance, he wanted Ratliff to succeed. *Id.*, p. 3.

Ratliff remained in the K-9 Unit, but he was later involved in a use of force incident in May 2019 that led to his removal. *Id.*, p. 3. Sergeant Owens reviewed the incident, and in light of Ratliff's prior deficiencies, concluded that

> Ratliff is not capable of being a handler to the levels that is required to maintain a constant level of basic abilities related to the job. I firmly believe Ratliff's personality, home life, and abilities to make quick smart decisions under stress are not up to par of those of a person that can handle a dog properly, safely, and successfully. Without a doubt Ratliff has an effect on dogs in his care that cause them to have such a drastic change in behavior and personality they become unable to be police dogs. That coupled with Ratliff's deficiencies and abilities to handle high stress situations and calls is a recipe for disaster. Of all the dogs I have selected and trained, Ratliff's dogs are the only ones that have had these issues. Every one of them. If you look back all the way to 2015, you will see poor decisions being made. We all know it comes down to just being able to do the job required of him. In my opinion Ratliff does not have what it takes to be a dog handler.

*Id.*, p. 3.

Sergeant Owens and Lieutenant Jeffrey Blundell recommended Ratliff's removal from the K-9 Unit once again for performance issues. *Id.*, pp. 1, 3; ECF 19-5, ¶ 9; ECF 19-6, ¶ 17. Then-Chief of Police Tony Jones, who had the sole discretion to appoint Ratliff, approved the recommendation, and Ratliff was removed from the K-9 Unit in August 2019. ECF 19-5, ¶ 10; ECF 19-6, ¶ 18; ECF 19-7, ¶¶ 5, 14.

Ratliff claims that after his removal, he met with Chief Jones and Captain Paris Owens, both of whom are African American, because Ratliff believed he was treated differently than officers in the K-9 Unit. ECF 19-1, 203:15–204:15. However, Ratliff does not know if he ever "used the verbiage 'race related'" in this conversation and he does not remember if he told Chief Jones and Captain Owens that he was treated differently than the *other* K-9 officers or the *Caucasian* K-9 officers. *Id.*, 204:1–15.

      C.    <u>Ratliff's Injury and Investigations into Worker's Compensation Fraud.</u>

As a result of the May 2019 incident, Ratliff broke his hand and received worker's compensation benefits. *Id.*, 125:7–24. In September 2019, the City received an anonymous report that Ratliff fraudulently represented his injury. *Id.*, 125:25–126:3; ECF 19-10, p. 1. GPD conducted a criminal investigation and found a lack of evidence to pursue criminal charges for worker's compensation fraud. ECF 19-1, 126:4–7, 127:8–21; ECF 19-10, pp. 2–3.

Following the criminal investigation, GPD commenced an internal investigation to determine whether Ratliff violated agency policy, which has a different standard than a criminal violation. ECF 19-1, 128:10–129:6; ECF 19-11, pp. 5–6. In June 2020, the allegation in the internal investigation was not sustained. ECF 19-1, 129:17–130:7; ECF 19-11, pp. 1, 6. However, after Ratliff's union representative raised a concern about the "not sustained" finding, GPD revised the alleged policy violation and changed the finding of the investigation to unfounded,

meaning GPD disproved the allegation. ECF 19-1, 130:8–132:25, 131:11–16; ECF 19-12; ECF 19-13, pp. 1, 6.

    D.    <u>Detective Selection Process for the Criminal Investigations Division.</u>

Prior to being considered for a detective position within the Criminal Investigations Division ("CID"), GPD officers must submit to an interview process and qualify for the detective eligibility list. ECF 19-14. An interview panel consisting of three GPD officers ranks officers in several tested areas. *Id.*; ECF 19-15; ECF 19-16; ECF 19-17. Each officer scoring 70% or higher is placed on the eligibility list for 180 days. ECF 19-14.

Five GPD officers, including Ratliff, applied for the March 2021 CID detective eligibility test; four of them qualified for the eligibility list. *Id.* Ratliff ranked fourth, but scored high enough to be placed on the eligibility list. ECF 19-1, 183:16–24, 190:9–14.  Thus, Ratliff was eligible to be selected for a detective position within the CID through September 2021.  *Id.*, 183:25–184:15.

At the time the eligibility list was determined, there were two open detective positions. ECF 19-7, ¶ 28. The interview panel recommended the officers with the two highest scores to Chief Jones, who had the ultimate authority to make the

assignment. *Id.* Because the highest scoring officer was not able to transfer immediately, Chief Jones selected the second and third highest scoring officers. *Id.*[2]

> E.   Final Compensation Order Issued by Worker's Compensation Judge.

Ratliff filed a petition seeking additional worker's compensation benefits, and a hearing was held in February 2021 before a worker's compensation judge. ECF 19-1, 139:16–140:12, 25, 141:1–6, 141:23–25, 187:14–17; ECF 19-18, p. 1. The judge issued an order on March 10, 2021 and concluded that Ratliff violated Florida law when he "made three intentional false, fraudulent and misleading oral statements for the purpose of obtaining workers' compensation benefits." ECF 19-18, ¶¶ 23, 37, 39; ECF 19-1, 141:7–22. Thus, a neutral party not employed by the City determined that Ratliff committed worker's compensation fraud. ECF 19-1, 188:10–189:5.

> F.   Ratliff's Resignation.

On April 15, 2021—less than one month after the judge found that Ratliff committed workers' compensation fraud—Ratliff resigned from employment with GPD. ECF 19-1, 27:13–18; ECF 19-19. Ratliff sent an email to Chief Jones stating that he was resigning to focus on his mental health. ECF 19-1, 27:21–28:9, 186:1–2; ECF 19-19. The email stated that Ratliff "tried to make this work for over the last year." ECF 19-19.

---

[2] Ratliff testified his non-selection was "[n]ot necessarily related to [his] race." ECF 19-1, 185:21–23.

Ratliff's resignation was not because of his non-selection for the detective position in CID. ECF 19-1, 186:1–3. In fact, at the time of Ratliff's resignation, he remained eligible for CID, and Ratliff admits Captain Anthony Ferrara made a reference to him on the day of his resignation that he would receive the next detective position. ECF 19-14; ECF 19-1, 184:16–185:5; ECF 19-7, ¶ 37.

G.    Ratliff's Pursuit of Other Law Enforcement Jobs while with the City.

Following his removal from the K-9 Unit in August 2019 and while he was still employed by the City, Ratliff applied for jobs with four law enforcement agencies in Washington during 2019 and 2020. ECF 19-1, 20:25–27:5.  Ratliff applied for these jobs because he "love[s] it out there," the pay was good, and he has friends there. *Id.*, 21:13–18, 24:6–9. Ratliff voluntarily removed himself from the application process with one agency, and he was not offered a job with the others because he failed a polygraph examination each time. *Id.*, 22:11–13, 23:8–10, 24:10–16, 26:3–15.

GPD Officer Drew Marshall, who worked for one of the agencies at the time of Ratliff's application, helped Ratliff get a job interview, and both he and Sergeant Owens wrote Ratliff references for multiple agencies. *Id.*, 23:21–24:2, 25:18–20, 196:18–197:5; ECF 19-20; ECF 19-5, ¶ 19; ECF 19-21, ¶¶ 7–8. Ratliff even stayed at Officer Marshall's apartment when Ratliff was looking for jobs in Washington. ECF 19-1, 197:6–11; ECF 19-21, ¶ 9.

H.    Ratliff's Allegations of a Hostile Work Environment.[3]

First, Ratliff alleges that after he was not selected for the K-9 Unit in 2012, he heard that Sergeant John Franklin used the n-word on two occasions. ECF 19-1, 53:10–25, 55:11–21. It is undisputed that these comments were not directed to Ratliff or made in his presence, and that Ratliff does not know whether Sergeant Franklin actually made either comment. *Id.*, 54:15–20, 55:4–7, 55:22-56:12.

Second, Ratliff alleges that when he was a member of the K-9 Unit in 2015, Corporal Kerkau would say "Sounds like there's some N words in the wood pile." ECF 19-1, 88:11–24. Ratliff also heard Corporal Kerkau use this phrase in 2017 and 2018 after Ratliff rejoined the K-9 Unit. *Id.*, 89:6–8. Ratliff admitted that Corporal Kerkau was his closest friend at GPD, he attended Corporal Kerkau's wedding, went drinking with Corporal Kerkau, and hung out with Corporal Kerkau outside of work. *Id.*, 90:6–25, 93:7–16, 21–24.

Ratliff described Corporal Kerkau's use of this n-word reference as "sporadic." *Id.*, 91:7–9. Ratliff also admitted that it did not impact his employment:

> Q:    You'd rather work on the K-9 unit with a guy who says the N word than not work on the K-9 unit?
>
> A:    I mean, yes, if that means that I get to keep my job as a K-9 handler, yes. That doesn't affect my relationship with the public and how I do my job

---

[3] While the City denies the allegations raised by Ratliff (ECF 19-5, ¶¶ 15–16; ECF 19-6, ¶¶ 22–23; ECF 19-8, ¶¶ 9–10; ECF 19-22, ¶ 13; ECF 19-21, ¶¶ 11–12), the City acknowledges that the Court must construe the facts in the light most favorable to Ratliff.

> because of, you know, his beliefs and how he feels
> about racial-related issues, I guess.
>
>     *     *     *     *     *     *     *     *     *
>
> Q:    You wanted to go back into the K-9 unit even
> though this guy[] uses the N word?
>
> A:    Yes, I wanted to be a K-9 handler.  Like I said, his
> personal beliefs and that, that doesn't affect me
> doing my job. At least how I treat citizens, you
> know, in that manner.

*Id.*, 92:21–93:6, 94:10–14.

Third, Ratliff claims that the K-9 officers teased him by calling him "Radio" because he always listened to his radio. *Id.*, 146:6–21. It was mostly Corporal Kerkau who called Ratliff "Radio." *Id.*, 146:22–147:1. After Ratliff learned that "Radio" was a mentally handicapped movie character, which Corporal Kerkau did not know (ECF 19-8, ¶ 15), Ratliff told Corporal Kerkau that he was offended by the nickname and requested that the officers stop using the nickname. ECF 19-1, 148:4–8, 149:17–21. After this, most officers stopped using the nickname. ECF 19-1, 149:22–23, 150:9–11. Although Corporal Kerkau continued using the nickname for a little bit, Ratliff did not complain to anyone or file a written complaint. *Id.*, 149:22–150:5.  Ultimately, the nickname "just kind of went away." *Id.*, 149:22–24. Any reference to Ratliff as "Radio" was based solely on Ratliff's hyper-focus on his radio and had nothing to do with his race. ECF 19-8, ¶¶ 13, 14, 16.

Fourth, Ratliff alleges that Sergeant Owens "randomly" used the n-word one time while the officers were off-duty and drinking at dinner in 2018 or 2019. ECF 19-1, 150:23–151:9, 152:15–21, 155:1–5. Ratliff admits that this comment "came out of absolutely nowhere" and that this was the first and only time that he heard Sergeant Owens say the n-word. *Id.*, 151:7–9, 152:22–153:1.

Fifth, Ratliff alleges that in response to Sergeant Owens' comment above, Sergeant Tommy Harrison stated, while at the same off-duty dinner, "Oh, poor Ed. Here are all these white cops saying the N word." *Id.*, 151:10–15. Ratliff heard Sergeant Harrison use the n-word one other time in 2020 at a bachelor party. *Id.*, 154:4–25.

Sixth, Ratliff alleges that Officer Marshall "was very intoxicated and proceed[ed] to go off on a very racist rant" at an off-duty party in December 2018. *Id.*, 164:22–165:15, 168:9, 195:22–196:18. According to Ratliff, Officer Marshall's off-duty comments "had no real merit on . . . what went on at K-9." *Id.*, 173:13–17.

Seventh, Ratliff asserts that Sergeant Owens commented about a Hitler mustache in April 2020 when discussing COVID guidelines specifying appropriate facial hair when wearing masks. *Id.*, 169:24–171:1, 189:14–20. Sergeant Owens called the graphic a Hitler mustache because it had a small amount of facial hair. ECF 19-5, ¶ 18.

The City has an anti-harassment policy in which it directs employees to notify City management or the City's Equal Opportunity Director as soon as possible after experiencing harassment. ECF 19-23, p. 2; ECF 19-7, ¶ 36. Despite acknowledging receipt of this policy (ECF 19-24), Ratliff never filed a written complaint of discrimination with the City or reported the allegations of discrimination until his exit interview.  ECF 19-1, 17:12–16, 54:10–13, 157:11–18, 169:18–23, 171:13–15, 199:6–8, 15–20; ECF 19-7, ¶ 38.

Ratliff admits he never filed a complaint regarding these allegations, but believes he *may have* spoken with Captain Owens about race-related issues.[4] ECF 19-1, 197:24–198:20, 200:3–16, 205:1–11. Ratliff admits he cannot remember if he spoke to Captain Owens regarding the Radio comment but would not have wanted it addressed or investigated.  ECF 19-1, 197:21–25, 198:1–20.  Similarly, Ratliff cannot recall if he spoke with Captain Owens regarding Corporal Kerkau's comments but does recall he "steered away from it." *Id*., 198:21–199:14, 200:3–201:13. As well, Ratliff did not complain about the Hitler comment. *Id*., 170:10–171:15. Lastly, Ratliff thinks he may have spoken to Captain Owens regarding Sergeant Owens' comment but thinks his discussion with Captain Owens may have been about a non-racial phone message he received from Sergeant Owens regarding

---

[4] Captain Owens denies that Ratliff ever discussed any race-related issues with her as Ratliff solely engaged in small talk about how he did not feel part of the K-9 team without providing any specifics. ECF 19-22, ¶¶ 9–10; *but see, supra*, note 3.

a performance issue. *Id.*, 200:3–201:13. Ratliff believes that regardless of the content of the conversation, Captain Owens encouraged him to say something. *Id.* However, Ratliff never complained and he never told Captain Owens that he wanted the issue addressed or investigated. *Id.*, 197:24, 198:20, 200:3–16, 205:1–11.

Additionally, Ratliff maintained a notebook tracking everything that impacted his work, and the notebook does not contain any references about anyone using the n-word. *Id.*, 171:19–174:16.

Ratliff had an exit interview with Chief Jones following his resignation, and raised vague allegations of workplace harassment and that K-9 Unit members called him Radio years prior. *Id.*, 192:6–8; ECF 19-7, ¶¶ 33–34. During the exit interview, Chief Jones called the City's Office of Equity and Inclusion so that Ratliff could file a complaint and had Ratliff speak with the office's director in private. ECF 19-1, 192:9–13, 204:16–19; ECF 19-7, ¶ 35.

## II.   ARGUMENT

### A.   Summary Judgment Standard.

Summary judgment is warranted when a plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgments in favor of defendants are not rare in employment discrimination cases. *See Earley v. Champion Int'l Corp.*, 907 F.2d

1077, 1080–81 (11th Cir. 1990).

B.   Ratliff has failed to establish the threshold requirement to hold the City liable under Section 1983.

For the City to be liable under Section 1983, Ratliff's alleged discrimination must be a custom or policy of the City and only an officer with final policymaking authority may subject the City to Section 1983 liability. *Jones v. Fulton Cty., Ga.*, 446 F. App'x 187, 189 n.3 (11th Cir. 2011); *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1479–81 (11th Cir. 1991) (quotation omitted) (a municipality may be liable if either a challenged action was taken by "a municipal official who has 'final policymaking authority'" or if the municipality had a widespread custom or practice of discrimination or harassment).

Ratliff cannot show that the City is liable under either prong. First, Ratliff cannot show any discriminatory or retaliatory actions taken by the final policymaker, Chief Jones. Ratliff must show that Chief Jones would not have made such decisions if he were Caucasian. *Comcast Corp. v. Natl' Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1014–1015 (2020). There is no evidence that Chief Jones had any discriminatory or retaliatory intent. In fact, Chief Jones is the same race as Ratliff, so it is more difficult for Ratliff to establish discriminatory animus. *See Moore v. Ala. Dep't of Corr.*, 137 F. App'x 235, 239 n.4 (11th Cir. 2005) ("Where decision-makers are also members of a protected class, the plaintiff faces a greater burden.").

13

Second, there is no evidence that the City had a longstanding or widespread practice of discrimination or retaliation. Isolated allegations of discrimination involving Ratliff are not sufficient evidence of "a widespread practice that . . . is so permanent and well settled as to constitute a custom or usage with the force of law." *Brown*, 923 F.2d at 1481 (quotation omitted).

C.     Ratliff's claims of discrimination and retaliation fail.

Summary judgment should be granted as to Ratliff's disparate treatment discrimination and retaliation claims because he cannot establish a prima facie claim or that the City's legitimate reasons for the employment actions were pretextual. Section 1981 race discrimination and retaliation claims premised upon circumstantial evidence are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Word v. AT&T*, 576 F. App'x 908, 912, 914 (11th Cir. 2014).[5] Initially, the employee must prove his prima facie claim. *Id.* If the employee meets that burden, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory, and non-retaliatory reason for the employment action. *Id.* If the employer satisfies its burden, the employee must prove that the employer's stated reason was a pretext for discrimination or retaliation. *Id.*

---

[5] Section 1981 discrimination and retaliation claims are analyzed under the same framework as Title VII claims.  *See Word*, 576 F. App'x at 912, 914.

*i.*     *Ratliff cannot establish a prima facie case of discrimination.*

To establish a prima facie case of race discrimination, a plaintiff must show that (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was qualified; and (4) his employer treated similarly situated employees outside his protected class more favorably. *Id.* Ratliff alleges that the following employment actions were taken because of his race: (1) non-selection for the K-9 Unit in 2012; (2) removal from the K-9 Unit in 2015; (3) PIP from 2018; (4) removal from the K-9 unit in 2019; and (5) criminal and internal investigations into his worker's compensation case from 2019.

Each alleged employment action will be addressed in turn below, but generally, Ratliff cannot establish that these were adverse employment actions (except for removal from the K-9 Unit in 2019), nor can he establish the existence of a comparator. Additionally, Ratliff cannot show he was qualified to be a K-9 handler. An adverse employment action is "a serious and material change in the terms, conditions, or privileges of employment." *McCone v. Pitney Bowes, Inc.*, 582 F. App'x 798, 800 (11th Cir. 2014) (quotation omitted). A valid comparator must be "similarly situated in all material respects" and have engaged in the same basic misconduct. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1218, 1227–28 (11th Cir. 2019).

a.   2012 Non-Selection and 2015 Removal from K-9 Unit.

Ratliff initiated this lawsuit nine years following his non-selection for the K-9 Unit in 2012 (ECF 19-1, 59:18–21) and six years following his removal from the K-9 Unit in 2015 (ECF 19-3). These claims are statutorily barred. *See Abram-Adams v. Citigroup, Inc.*, 491 F. App'x 972, 975 (11th Cir. 2012) (Section 1981 claims time barred because complaint filed over four years after claims accrued).

b.   2018 PIP, 2019 Removal from K-9 Unit, and 2019 Investigations.

Ratliff's PIP and the investigations into his alleged worker's compensation fraud are not adverse employment actions. An employee's placement on a PIP is not an adverse employment action unless it "resulted in a serious and material change in the terms, conditions, or privileges of his employment." *Redd v. United Parcel Serv., Inc.*, 615 F. App'x 598, 603 (11th Cir. 2015). Because Ratliff successfully completed the PIP and remained in the K-9 Unit (ECF 19-1, 109:15–25), the PIP is insufficient, as a matter of law, to constitute an adverse action.

Likewise, the two investigations into Ratliff's alleged worker's compensation fraud were not adverse employment actions because they did not result in a "serious and material change in the terms, conditions, or privileges of her employment." *See Corbett v. Beseler*, No. 3:14-cv-1507-J-32JBT, 2016 WL 5239854, at *4–5 (M.D. Fla. Sept. 22, 2016) (quotation omitted) (four internal investigations into a deputy were not adverse actions). The criminal investigation did not result in any criminal

charges filed against Ratliff and the internal investigation was unfounded. ECF 19-1, 126:4–7, 127:8–21, 130:8–132:25; ECF 19-10; ECF 19-13. Thus, the two investigations "did not materially affect [Ratliff's] employment." *See Corbett*, 2016 WL 5239854, at *5.

As well, Ratliff was not qualified to be a K-9 handler when he was removed in 2019. ECF 19-6, ¶ 17.

Additionally, Ratliff cannot establish a prima facie case of race discrimination premised upon his PIP, 2019 removal from the K-9 Unit, and two investigations because he was not treated less favorably than similarly situated employees outside his protected class. Ratliff has not and cannot identify any other K-9 officer who exhibited the same performance concerns as a dog handler or who was accused of worker's compensation fraud and received more favorable treatment. In fact, Ratliff was treated the same as Caucasian K-9 officers as Sergeant Owens has recommended the removal of three Caucasian officers for performance and work product issues. ECF 19-5, ¶ 11.

### ii.  *Ratliff cannot establish a prima facie case of retaliation.*

To establish a prima facie case of retaliation, "a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (quotation

omitted). There is no evidence that Ratliff engaged in protected activity that was the but-for cause of any employment action.

Ratliff asserts three protected activities: (1) a meeting with Chief Jones and Captain Owens following his removal from the K-9 Unit in 2019; (2) small talk with Captain Owens; and (3) his exit interview with Chief Jones in April 2021. Additionally, Ratliff alleges that his non-selection for a detective position within CID was retaliatory.

In the context of a Section 1981 retaliation claim, the plaintiff must show that he had "a good faith, reasonable belief that the employer was engaged in . . . racial discrimination." *Bell v. City of Auburn, Ala.*, 722 F. App'x 898, 900 (11th Cir. 2018). In addition to showing that an employee had a subjective belief that his employer was engaged in unlawful employment practices, an employee must show that this belief "was *objectively* reasonable in light of the facts and record presented." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). Ratliff cannot satisfy this standard for the first two alleged instances of protected activity.

Ratliff could not recall whether he told Chief Jones and Captain Owens that he was treated differently than the *other* K-9 officers or the *Caucasian* K-9 officers. ECF 19-1, 204:1–15. Thus, there is no evidence that Ratliff brought forth a claim of race discrimination during this August 2019 meeting, and therefore no evidence that Ratliff engaged in protected activity during the meeting. *See Martin v. Fin. Asset*

*Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020) ("could have told" is not the same as "did tell"); *see also Bell*, 722 F. App'x at 901 (no protected activity when complaint about overtime did not allege that it was based on race); *Biggers v. Koch Foods of Ala., LLC*, 461 F. Supp. 3d 1176, 1186–87 (M.D. Ala. 2020) (complaints based on belief that harassment was racial because there seemed to be no other reason is not protected activity).

Additionally, Ratliff claims that he *possibly* spoke with Captain Owens about race-related issues. ECF 19-1, 197:24–198:20, 200:3–16, 205:1–11. First, Ratliff alluded to a potential conversation he had with Captain Owens about the "Radio" nickname, but Ratliff was not sure if he actually spoke with Captain Owens or told her about a race issue. *Id.*, 197:24–198:20. Second, Ratliff is not sure he spoke with Captain Owens about Sergeant Owens' racial comment. *Id.*, 200:3–16. Third, Ratliff claims that he told Captain Owens that he was the only K-9 officer with restrictions. *Id.*, 205:1–11.

These potential discussions with Captain Owens fail to show that Ratliff complained of race discrimination or harassment. Ratliff's failure to "explicitly or implicitly communicate a belief that the conduct suffered by [him] constitutes unlawful employment discrimination" negates a finding that he engaged in protected activity. *Poague v. Huntsville Wholesale Furniture*, 369 F. Supp. 3d 1180, 1194–95 (N.D. Ala. 2019) (quotation omitted); *see also Butler v. Ala. Dep't of Transp.*, 536

F.3d 1209, 1214 (11th Cir. 2008) (quotation omitted) (opposition to single racially derogatory remark is not protected conduct).

Additionally, Ratliff never told Captain Owens that he wanted anything addressed or investigated, and despite Captain Owens' encouragement to report the conduct, Ratliff failed to do so. ECF 19-1, 198:10–15, 200:3–16, 205:6–11. Further, Ratliff's notebook tracking everything that impacted his work does not contain any references about race discrimination. *Id.*, 171:19–174:16. Ratliff's failure to pursue these issues shows that any subjective belief that Ratliff suffered harassment was not objectively reasonable.[6]

Thus, the only form of protected activity that Ratliff can rely upon is when he raised allegations of workplace harassment to Chief Jones during his exit interview. *Id.*, 192:6–8. However, Ratliff's protected activity in April 2021 cannot, as a matter of law, be the but-for cause of his non-selection for CID in March 2021. *See Anduze v. Fla. Atl. Univ.*, 151 F. App'x 875, 877 (11th Cir. 2005) (no causation because protected activity occurred after adverse action).

---

[6] Although Ratliff claims that he did not file a complaint because of a fear of retaliation (ECF 19-1, 54:14–24, 157:8–10, 163:24–164:21, 199:9–14, 200:7–9), his unsubstantiated fear of retaliation is not reasonable and does not excuse his failure to file a complaint. *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1307 (11th Cir. 2007) (fear of being fired did not excuse failure to complain).

> ### iii.   *Ratliff cannot establish that the City's legitimate reasons for its actions were a pretext for race discrimination or retaliation.*

The City has proffered legitimate reasons for all employment actions against Ratliff. Specifically, (1) Ratliff was placed on the PIP in 2018 because of deficient performance (ECF 19-1, 104:17–23; ECF 19-9); (2) Ratliff was removed from the K-9 Unit in 2019 after continued performance problems (ECF 19-4; ECF 19-7, ¶ 14); (3) Ratliff was placed under investigations in 2019 because the City received an anonymous report that Ratliff engaged in worker's compensation fraud (ECF 19-1, 125:25–126:3; ECF 19-10; ECF 19-13); and (4) Ratliff was not selected for CID in March 2021 because other candidates scored higher (ECF 19-7, ¶ 28). Thus, any presumption of discrimination or retaliation is rebutted, and the burden shifts to Ratliff to offer evidence of pretext. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

To prove pretext, Ratliff must demonstrate that the City's proffered reasons for the employment actions were false and that discrimination or retaliation was the real reason. *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007). If the City's reason is "one that might motivate a reasonable employer, [Ratliff] must meet that reason head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). The Eleventh Circuit has "repeatedly stated [that it] will not second-guess the wisdom of an employer's decision as long

as the decision is not for a [discriminatory or] retaliatory reason." *Dugandzic v. Nike, Inc.*, 807 F. App'x 971, 977 (11th Cir. 2020).

Here, there is no evidence that the City's reasons are false or that the real reason was discrimination or retaliation. In fact, there is nothing to discredit the legitimate reasons relied upon by the City for the employment actions it took with Ratliff. First, although Ratliff claims that his placement on the PIP was discriminatory, Ratliff successfully completed the PIP and remained assigned to the K-9 Unit for another year. ECF 19-1, 109:15–25.

Second, Ratliff's assertion that his removal from the K-9 Unit was motivated by his race defies logic because (1) Ratliff was encouraged to return to the unit; (2) Ratliff was selected over two Caucasian officers; and (3) Ratliff stayed in K-9 despite performance concerns. *Id.*, 96:13-20, 98:3–20; ECF 19-4, pp. 1, 3; ECF 19-8, ¶¶ 6–7.

Third, Ratliff's claim that he was investigated because of his race is preposterous because Ratliff was exonerated by GPD for all administrative, policy, and criminal allegations. ECF 19-1, 126:4–7, 127:8–21, 130:8–132:25; ECF 19-10; ECF 19-13. GPD even revised the finding from the internal investigation to be more favorable to Ratliff. ECF 19-1, 131:11–16.

Fourth, although Ratliff was not initially selected for CID, he was selected to be on the eligibility list for 180 days. *Id.*, 183:16–184:15, 190:9–14; ECF 19-14.

Ratliff was solely responsible for not being selected because he resigned from employment while he remained eligible and under consideration for selection. ECF 19-14; ECF 19-1, 184:16–185:5; ECF 19-7, ¶ 37.

Thus, Ratliff cannot establish that the reasons articulated by the City for the employment actions were pretextual. *Grant v. Miami-Dade Cty. Water & Sewer Dep't*, 636 F. App'x 462, 467 (11th Cir. 2015) (courts "will not simply speculate that [the employment action] was done for a discriminatory purpose").

> ### D.   Ratliff was not subjected to a hostile work environment.

Summary judgment should be granted on Ratliff's hostile work environment claim because the harassment was not sufficiently severe or pervasive and there is no basis to hold the City liable.[7] To prevail on a hostile work environment claim, a plaintiff must prove that (1) he is in a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for the conduct. *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (quotation omitted).

---

[7] A hostile work environment claim under Section 1981 is analyzed in the same manner as under Title VII. *Smith v. Mt. Sinai Med. Ctr. of Greater Miami, Inc.*, 36 F. Supp. 2d 1341, 1348 n.12 (S.D. Fla. 1998).

     *i. The alleged harassment was not sufficiently severe or pervasive.*

   Requiring that conduct be sufficiently severe or pervasive to alter terms and conditions of employment "is the element that tests the mettle of most [] harassment claims." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). The severe or pervasive requirement involves both an objective and subjective component. *Id.* To evaluate the objective severity of the harassment, courts look at the totality of the circumstances and consider the frequency and severity of the conduct, whether the conduct is physically threatening or humiliating or mere offensive utterances, and whether the conduct unreasonably interferes with job performance. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).

   Teasing, offhand comments, and isolated incidents are not sufficient to alter terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) Rather, the conduct must involve "patterns or allegations of extensive, long lasting, unredressed, and uninhibited [] threats or conduct that permeated the plaintiffs' work environment." *Gupta,* 212 F.3d at 586 (quotation omitted).

   Here, over the course of thirteen years, Ratliff alleges that five officers[8] sporadically used the n-word, called him "Radio," and commented about a Hitler

---

[8] Ratliff's close relationship with three of the alleged harassers, Corporal Kerkau, Officer Marshall, and Sergeant Owens (ECF 19-1, 90:6–25, 93:7–16, 21–24, 196:18–197:11; ECF 19-5, ¶ 19; ECF 19-21, ¶¶ 7–9), undercuts his subjective belief that they harassed him. *See Johnson v. Family*

24

mustache. Taken as a whole, this conduct was not severe or pervasive enough to create a hostile work environment. While the use of the n-word is offensive, the "mere utterance of an epithet which engenders offensive feelings in a[n] employee does not sufficiently affect the conditions of employment." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal references omitted). "[T]he racial slurs allegedly spoken by co-workers ha[ve] to be so commonplace, overt and denigrating that they create[] an atmosphere charged with racial hostility." *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1521 (11th Cir. 1995) (quotation omitted).

Here, excluding Corporal Kerkau's use of the n-word, two of the six remaining instances in which an officer allegedly used the n-word were not in Ratliff's presence (ECF 19-1, 56:6–12), while the other four were isolated occurrences when the officers were off-duty and the use of the n-word was not directed toward Ratliff (*id.*, 150:23–151:15, 152:15–21, 154:4–25, 165:6–15, 168:9, 173:3–17). These comments are insufficient to establish a hostile work environment. *Ceus v. City of Tampa*, 803 F. App'x 235, 247 (11th Cir. 2020) (racial comments made outside of work did not result in hostile work environment); *Butler*, 536 F.3d at 1213 (co-worker's use of n-word in plaintiff's presence twice a few minutes apart

---

*Practice & Injury Ctr., Inc.*, 437 F. Supp. 3d 1108, 1124 (M.D. Fla. 2020) ("Plaintiff's decision to wish to the person whom she claims made racially derogatory comments a happy birthday undercuts her attempt to establish a good faith belief that Defendants engaged in an unlawful employment practice by virtue of [the alleged harasser's] comments.").

while they were away from work did not create a hostile work environment); *Quarles v. Con-Way Freight, Inc.*, No. 8:07-cv-200-T-27MAP, 2008 WL 1994916, at *7, 8 (M.D. Fla. May 8, 2008) (no hostile work environment when plaintiff did not hear firsthand the n-word, and supervisor calling plaintiff "Black Jew" was not severe because it was an "off-handed comment[] in the course of casual conversation").

As related to Corporal Kerkau's use of the n-word, Ratliff admitted that this was "sporadic" and had absolutely no impact on his employment and his desire to remain in the K-9 Unit. ECF 19-1, 91:1–9, 92:21–25, 93:1–6; *see also McCann*, 526 F.3d at 1379 (no racially hostile work environment when plaintiff "actually testified that [the alleged hostile environment] did not affect her work"). In fact, after Ratliff was removed from the K-9 Unit the first time, he still wanted to return to the unit even knowing that Corporal Kerkau had previously used the n-word. ECF 19-1, 94:10–14; *see also Marable v. Marion Military Inst.*, 595 F. App'x 921, 927–28 (11th Cir. 2014) (no racially hostile work environment as plaintiff "admitted that he was able to perform his job duties satisfactorily at all times during his employment").

Ratliff's allegations of the use of the n-word are similar to the allegations in *Freeman v. City of Riverdale*, in which the Eleventh Circuit found that the allegations "were insufficient to support a hostile work environment claim." *See* 330 F. App'x 863, 866 (11th Cir. 2009). The court reasoned that

> Freeman alleged approximately 11 incidents involving the
> use of racially derogatory language that spanned the length

> of his thirteen-year career, with five of those incidents involving comments made directly toward him or otherwise in his presence. These statements were too sporadic and isolated to establish discrimination so objectively severe and pervasive as to alter the terms and conditions of Freeman's employment.

*Id.*; *see also Fortson v. Carlson*, 618 F. App'x 601, 603, 607 (11th Cir. 2015) (twelve incidents of racial harassment, including nine racial epithets, spanning seven months of 2.5 years of employment was not severe or pervasive).

Similar to the majority of the times in which the n-word was used, Sergeant Owens' reference to a Hitler mustache was a one-time occurrence. Further, when taking into account the context in which the comment was made—namely, the types of facial hair permitted under COVID guidelines (ECF 19-1, 169:24–171:1; ECF 19-5, ¶ 18)—it is clear that this was a non-offensive, offhand comment, and insufficient to support Ratliff's hostile work environment claim. *Quarles*, 2008 WL 1994916, at *6–7 (supervisor's use of n-word, "in context, cannot be considered objectively offensive").

Ratliff acknowledged that his nickname of "Radio" began as simple teasing, not because of his race, but because he would constantly listen to the police radio. ECF 19-1, 146:6–21; *see also Quarles*, 2008 WL 1994916, at *8 (racial comment made in joking manner, rather than threatening manner, is insufficient to prove harassment). After Ratliff eventually requested that K-9 officers no longer use the nickname, most officers complied, and there is no evidence that the nickname

impacted Ratliff's work performance or was based on his race.  ECF 19-1, 149:17–24; ECF 19-8, ¶¶ 13, 14, 16.

It is clear that Ratliff's allegations constitute "mere offensive utterances," rather than severe or pervasive conduct.  *Johnson*, 437 F. Supp. 3d at 1129. "These comments were unaccompanied by physical threats, humiliating conduct, or even any physical harm." *Id.*; *see also Fortson*, 618 F. App'x at 603, 607–08 (despite co-workers' physical threats accompanied by calling plaintiff "black ass," plaintiff "did not present any evidence on which reasonable jury could find he was subjected to sufficiently physically threatening or humiliating harassment").

The Eleventh Circuit's decision in *Barrow v. Ga. Pac. Corp.* shows the distance between evidence introduced by Ratliff and an actionable claim for hostile work environment. 144 F. App'x 54 (11th Cir. 2005). In *Barrow*, the court affirmed summary judgment in favor of the employer on grounds that displays of "KKK" and a noose, supervisors calling the plaintiff the n-word and other derogatory names, and threats of violence toward the plaintiff only amounted to "evidence of isolated, sporadic instances of racial harassment over [the plaintiff's] more than fourteen years of employment." *Id.* at 57–58. Clearly, the conduct that the plaintiff was subjected to in *Barrow* is much more egregious than the conduct alleged by Ratliff. If the allegations fell short in *Barrow*, Ratliff's must as well.

ii.     *There is no basis to hold the City liable.*

The legal framework for determining whether the City is liable for alleged harassment differs depending on whether the alleged harassers are co-workers or supervisors. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). An employee is considered a supervisor for purposes of a hostile work environment claim if he is empowered to take tangible employment actions, such as hiring, firing, or promotions. *Id.* at 431; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

Here, as the alleged harassers—namely, Sergeant Franklin, Corporal Kerkau, Sergeant Owens, Sergeant Harrison, and Officer Marshall—were not empowered by the City to take tangible employment action against Ratliff, they are not supervisors for purposes of Ratliff's hostile work environment claim. ECF 19-25, p. 17 (Chief decides discipline); ECF 19-7, ¶ 5 (Chief decides special duty assignments). Thus, the City "is liable only if it was negligent in controlling working conditions." *Vance*, 570 U.S. at 421.  This requires Ratliff to show that the City "knew or should have known of the harassing conduct but failed to take prompt remedial action." *Baldwin*, 480 F.3d at 1302 (quotation omitted). This, Ratliff cannot do.

First, the City did not have actual notice about the alleged harassment. "Actual notice is established by proof that management knew of the harassment." *Hill v. Wal-Mart Stores, Inc.*, 510 F. App'x 810, 814–15 (11th Cir. 2013) (quotation omitted). Here, Ratliff never reported any of the alleged harassment to City management or

the City's Equal Opportunity Director (ECF 19-1, 17:12–16, 54:10–13, 157:11–18, 169:18–23, 171:13–15, 199:6–8, 15–20; ECF 19-7, ¶¶ 38), and his failure to avail himself of the City's anti-harassment policy is dispositive. *See Terrell v. Paulding Cty.*, 539 F. App'x 929, 932–33 (11th Cir. 2013) (no actual notice when employee met with department head and human resources to discuss harassment by co-workers but declined to discuss specific examples); *Cramer v. Bojangles' Rests., Inc.*, 498 F. App'x 885, 886 (11th Cir. 2012) (employer did not have notice of harassment when employee reported it to immediate supervisor rather than reporting pursuant to anti-harassment policy).

Additionally, the City did not have constructive notice about the alleged harassment because it has an anti-harassment policy directing employees to notify City management or the City's Equal Opportunity Director as soon as possible after experiencing harassment. *See Hill*, 510 F. App'x at 815 (no constructive knowledge when employer had anti-harassment policy allowing for employees to bring complaints to management).

Second, the City is not liable because it took prompt remedial action once it became aware of the alleged harassment.[9] When Ratliff informed Chief Jones about

---

[9] Based upon the lack of substance Ratliff provided to Captain Owens and Captain Owens not being a member of City management as articulated in the City's anti-harassment policy, it is clear that Ratliff's discussions with Captain Owens did not put the City on notice about the alleged harassment. Nevertheless, there is no basis to hold the City liable because Captain Owens acted reasonably by encouraging Ratliff to file a complaint so that the allegations could be investigated.

the alleged harassment for the first time during his exit interview, Chief Jones took

prompt remedial action by calling the City's Office of Equity and Inclusion and

having Ratliff privately talk to the office's director to file a complaint. ECF 19-1,

192:6–13, 204:16–19; ECF 19-7, ¶ 35.

In short, the record is devoid of any evidence that the City knew about alleged

harassment toward Ratliff and allowed it to continue.

E.   Ratliff was not constructively discharged.

Summary judgment should be granted as to Ratliff's claim that he was

constructively discharged because he cannot satisfy the high burden to show a

constructive discharge.[10] "Constructive discharge occurs when an employer

deliberately makes an employee's working conditions intolerable and thereby forces

him to quit his job." *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1268 (11th Cir.

2021). Intolerable working conditions must be tied to a protected characteristic—in

this case, Ratliff's race or protected activity. *Giles v. BellSouth Telecomms., Inc.*,

542 F. App'x 756, 761 (11th Cir. 2013).  The Eleventh Circuit has "set a high bar

---

ECF 19-1, 200:3–16. However, Ratliff failed to take advantage of Captain Owens' advice and the reporting provisions in the City's anti-harassment policy. *Id.*, 197:24–198:20, 205:1–11; *see also Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1301, 1302 (11th Cir. 2000) (no notice because plaintiff did not approach the mid-level managers "in a professional capacity to request assistance with correcting [the harasser's] behavior," and plaintiffs failed to act reasonably when they did not request the mid-level managers take any action to stop the harassment and "declined the assistance of a mid-level manager").

[10] A constructive discharge claim under Section 1981 is analyzed in the same manner as under Title VII.  *Smith*, 36 F. Supp. 2d at 1348 n.12.

for claims of constructive discharge." *Matias v. Sears Home Improvement Prods., Inc.*, 391 F. App'x 782, 788 (11th Cir. 2010).

Ratliff's constructive discharge claim fails for several reasons. First, Ratliff began applying for other jobs well before he quit (ECF 19-1, 23:21–24:2), yet continued working for GPD for nearly two years, which negates his claim because "[c]ourts have found that staying on at a job after contemplating leaving weighs against a finding of constructive discharge." *Clarke v. Healthsouth Corp.*, No. 8:14-cv-778-T-33AAS, 2021 WL 149265, at *8 (M.D. Fla. Jan. 15, 2021) (no constructive discharge where plaintiff remained working for defendant for one year after applying for other jobs), *aff'd by* No. 21-10421, 2021 WL 6102260 (11th Cir. Dec. 23, 2021).

Second, it is undisputed that the latest harassment Ratliff allegedly experienced occurred in April 2020, one year prior to his resignation. ECF 19-1, 189:7–20; ECF 19-19. As Ratliff maintained his employment with GPD for an entire year following the end of the alleged harassment, his constructive discharge claim fails as a matter of law. *See Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1313, 1317 (11th Cir. 1989) (no constructive discharge where harassment ended twelve days before plaintiffs resigned); *Annarumma v. City of High Springs*, No. 1:18-cv-143-AW-GRJ, 2020 WL 8367525, at *2, 3 (N.D. Fla. Feb. 20, 2020) (no

constructive discharge where the harassment stopped four months before resignation), *aff'd by* 846 F. App'x 776 (11th Cir. 2021).

Lastly, the undisputed evidence shows that Ratliff ignored Captain Owens' encouragement and never filed a complaint with GPD about the alleged discrimination and retaliation. ECF 19-1, 17:12–16, 54:10–13, 157:11–18, 169:18–23, 171:13–15, 197:24–198:20, 199:6–8, 15–20, 200:3–16, 205:1–11. "Not only is [Ratliff's] failure to avail himself of [the City's] mechanisms for reporting and resolving complaints of discrimination glaring, it is also fatal to his claim of constructive discharge." *Matias*, 391 F. App'x at 788.

## III.   CONCLUSION

The City respectfully requests that the Court grant the Motion and enter judgment as a matter of law in favor of the City.

February 23, 2023                                   Respectfully Submitted,

                                    By: */s/ Marc A. Sugerman*
                                    Marc A. Sugerman
                                    Florida Bar No. 0081876
                                    Howard M. Waldman
                                    Florida Bar No. 1002881
                                    **FORDHARRISON LLP**
                                    300 South Orange Avenue, Suite 1300
                                    Orlando, Florida 32801
                                    Telephone:  407-418-2310
                                    Facsimile:  407-418-2327
                                    msugerman@fordharrison.com
                                    hwaldman@fordharrison.com

                                    and

Michele F. Martin
Senior Assistant City Attorney
Florida Bar No. 474940
City of Gainesville, Office of the City
Attorney
200 East University Avenue, Suite 425
Gainesville, Florida 32601
Telephone:  (352) 334-5011
Facsimile:  (352) 334-2229
martinmf@cityofgainesville.org
allenla@cityofgainesville.org

*Attorneys for Defendant*

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that the foregoing Motion contains 7,996 words and therefore complies with the N.D. Fla. Local R. 7.1(F).

*/s/ Marc A. Sugerman*
Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 23, 2023, I electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, which will serve an electric copy to all parties of record.

*/s/ Marc A. Sugerman*
Attorney

WSACTIVELLP:13817107.1

34