UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

EDWARD RATLIFF,

    Plaintiff,
v.                                                    Case No. 1:22-cv-00156-AW-MAF

CITY OF GAINESVILLE,

    Defendant.
_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S CASE DISPOSITIVE MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Plaintiff, EDWARD RATLIFF (hereafter "Plaintiff" or "Ratliff") files this Response and Memorandum of Law opposing Defendant's Case Dispositive Motion for Summary Judgment, based on the following grounds:

## INTRODUCTION

Plaintiff's Complaint alleges claims of race discrimination and retaliation, and hostile work environment against the CITY OF GAINESVILLE (hereafter "the City" or "Defendant") in violation of 42 U.S.C. § 1981, as pled through 42 U.S.C. § 1983. Defendants Motion for Summary Judgment should be denied because the Plaintiff has made a prima facie case for each claim, and because significant material facts in the record are in dispute.

## FACTUAL BACKGROUND

Ratliff was hired by the Gainesville Police Department, which is a department in the City of Gainesville, in 2008. (Pltf.depo,p.46,ll.16-20). Ratliff was appointed to the K-9 Unit in March of 2015. (Pltf.depo,p.52,ll.7-11). He was removed from the K-9 Unit in July of 2015. (Pltf.depo,p.77,ll.2-4). At the time, he was the only Black officer in the unit.

Ratliff rejoined the K-9 Unit in April of 2017. (Pltf.depo,p.95,ll.13-15). A little over a year later, in May of 2018, Ratliff was placed on a Performance Improvement Plan (Pltf.depo,p.104,ll.17,20-21). Three months later in August of 2019, Ratliff was removed from the K-9 unit again.

In May of 2019, Ratliff was accused of workers compensation fraud. A criminal investigation and an internal investigation by the City failed to turn up evidence to support the charges. The investigation initially issued a finding of "not sustained," but the City later changed the finding to "unfounded" because the allegations lacked any merit.

Ratliff was turned down for a position in the Criminal Investigations Division in March of 2021. Finally, in April of 2021, Ratliff resigned due to the mental and emotional distress he was subjected to at the City.

Ratliff has testified that he was subjected to numerous racial slurs over the course of his employment with the City. The racial slurs came from officers and

supervisors and were highly offensive and caused Ratliff considerable mental and emotional distress. The frequency and the openness of the comments made it clear that top management permitted White officers to make racial slurs in the presence of, or even directed toward, Black officers. It appears that no action was taken during Ratliff's employment to stop the use of racial slurs at the Police Department by the Police Chief, who had the final policymaking authority for the department. At the very least, the use of racial slurs was a widespread custom or practice that was accepted at the police department. Regardless of his race, which was African American, Police Chief Tony Jones accepted the widespread practice by White officers to use the "N" word in the workplace.

 Defendant's defense is that Ratliff tolerated the slurs rather than jeopardize his career by refusing to work in the K-9 unit, where many of the racial slurs were uttered. Ratliff testified that his goal was to be a K-9 handler and he believed that if he complained or refused to work in the unit, he could jeopardize his career.

 Some of the things Ratliff heard are extremely disturbing. Furthermore, it is no defense that Defendant's employees were joking when they made the slurs. It is doubtful that a jury would find such offensive language funny or entertaining, even if was intended to be so. Referring to Black officers getting in trouble as "Ns in the wood pile," cannot be justified or argued away. It is offensive in any context. (*See* Ptf.depo,p.89,ll.1-16). Ratliff also testified that Sgt. Owens used the "N" work in

3

his presence at work. (Ptf.depo,p.93,ll.19-20). In January of 2019, Sgt. Owens stated that his K-9 dog bit a lot of "Ns." (Ptf.depo,p.155,ll.1-13). At that time, another sergeant, Tommy Harrison said, "Poor Ed, he has to hear all the White cops use the "N" word." Harrison also used the "N" word at a party in November of 2020. (Ptf.depo,p.154,ll.13-25).

Another officer, Drew Marshall, went on a racist rant at a retirement party for a colleague, using the "F" word and the "N" word repeatedly. (Ptf.depo,p.165,ll.2-15;p.167,ll.11-18) The comments caused Ratliff considerable distress. (Ptf.depo,p.165,ll.16-24). When his supervisor, Jeff Kerkau, saw that Ratliff was upset, he justified the comments saying Black people use the "N" word all the time. (Ptf.depo,p.167,ll.19-25).

These comments show that there was a mindset at the top level of the police department and a belief by many veteran police officers that it was acceptable to use racial slurs and to tell racist jokes.

In addition to subjecting Ratliff to racial slurs, his White supervisors teased him by calling him "Radio," a nickname given to a Black character in a movie who was mentally challenged. The City argues the nickname was based solely on the fact that both men liked listening to their radios. However, when Ratcliff pointed out that he was being compared to a mentally challenged Black man, his supervisor said, "Yes, we know. That's why its funny."

The nickname offended Ratliff and he complained to his supervisor that he was offended. His supervisor nevertheless continued to call him by that nickname for a short period of time. (Ptf.depo,pp.149 and 150).

## LEGAL ARGUMENT

### Ratliff Met the Threshold for a § 1983 Claim

The racial environment in the police department, and the K-9 unit in particular, was tolerated by the Police Chief and his administrators, who did little to punish perpetrators of race discrimination. This tolerance among officers and supervisors established an environment where it was acceptable to make racial slurs and to make fun of African Americans. The City is liable if it established a widespread practice that, although not authorized by an expressed written policy, is so permanent and well settled that it constitutes a custom or usage with the force of law. Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1479-81 (11th Cir. 1991).

An officer with final policymaking authority, such as the police chief, can establish a custom or policy that would subject the City to § 1983 liability. Id. *See also* Jones v. Fulton County, Georgia, 446 F.Appx. 187, 189 n.3 (11th Cir. 2011). A municipality may be liable if the action was taken by a "a municipal official who has final policymaking authority" or if there was a custom or practice of discrimination or harassment. Id. at 1480. An action by the City is not limited to decisions by the legislative body. City policy may be implicated by the acts of individual policy-

5

making officials, such as the police chief, or by a pervasive custom. Id. at 1480. The City is responsible for actions taken by an official who possesses final authority to establish municipal policy and by his action subject the government to liability. Id.

A policy that is a widespread practice may be so well settled a custom as to constitute a custom or usage having the force of law. Id.

The fact that the Chief was African American should not be the determining factor if the Chief as the top official allows an atmosphere of racial hostility to prevail. The record shows a widespread practice of discrimination over the course of years that was never addressed by the police department or the City. These widespread practices are "so permanent and well settled as to constitute a custom or usage with the force of law." See, Brown, 923 F.2d at 1481. The contours of the rights violated by the use of racial slurs and discriminatory acts were sufficiently clear that a reasonable officer would understand that they were violations. Id.

**Discrimination and Retaliation**

42 U.S.C. § 1981 protects plaintiffs against the loss of legally protected rights on account of race. Plaintiff was subjected to adverse employment actions in contrast with similarly situated employees outside of his protected class.

If a defendant would have responded differently but for the plaintiff's race, then the plaintiff has not received the same rights as persons outside its protected class. Comcast Corp. v. National Association of African American-Owned Media,

140 S.Ct. 1009, 1012, 1015 (2020). In order to establish a prima facie case of race discrimination, Plaintiff must show: (1) Ratliff is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified; and (4) his employer treated similarly situated employees outside his protected class more favorably.

Ratliff was a member of a protected class in that he was an African American. He suffered numerous adverse employment actions in that he was removed from the K-9 Unit twice; he was given critical performance reviews and subjected to criminal and internal investigations into baseless charges. The investigations accused him of committing fraud, which, regardless of the outcome, cast a pall over his professional career for the rest of his life. To say nothing of the fact that he was continually over the span of years subjected to racial slurs and ridicule based on his race. There is a factual dispute over the K-9 dogs assigned to Ratliff and how they performed under his guidance. (Ptf.depo,p.103,ll.23-25;p.107). Ratliff was subjected to a series of adverse actions that affected the terms and conditions of his employment. At the very least, these actions contain numerous factual disputes precluding summary judgment.

**Adverse Employment Action**

Denial of a promotion can be an adverse employment action. An adverse employment action includes demotions, such as being removed from a special unit, such as the K-9 unit. *See* Corbett v. Beseler, 2016 U.S. Dist. LEXIS 129639 (M.D.

7

Fla.). The conduct must alter the employee's compensation, terms, conditions, or privileges of employment, deprive him of employment opportunities, or adversely affect his status as an employee. Id. at 12. The change in employment must be serious and material. Id. The employment action must be materially adverse to a reasonable person under the circumstances. Id. at 13.

Removal from the K-9 unit was an adverse action in that it denied Ratliff the position and the career that he wanted to pursue in law enforcement. Additionally, he was denied promotions and was subjected to racial slurs and ridicule. Furthermore, see the argument below how a series of continual employment actions could constitute a single adverse action.

**Ratliff Was Treated Differently Than Non-African Americans**

It must be assumed that Ratliff was qualified for the K-9 unit, since he was assigned to the unit twice by the department. If Ratliff was unqualified for the position, why would the City assign him to the unit a second time?

Finally, Ratliff was treated differently than non-African American employees in that he was subjected to racial slurs and was much more closely scrutinized during his time in the K-9 to the point of harassment. His White supervisors criticized Ratliff's personal life and his relationships, and even leaned on him to sell his house and to stop living with his fiancé, who was White. (Ptf.depo,p.115,ll.6-18;p.158,ll.11-20;p.159,ll.9-24). The department did not interject itself into the

personal lives of non-minority employees in this intrusive manner. Therefore, Ratliff was subjected to disparate treatment.

Another material fact dispute is that Ratliff denied the police department's assertion that he left his K-9 dog frequently to go out and socialize. Ratliff testified that he did not leave his dog at home any more than White officers in the K-9 unit. (Plt.depo,p.111,ll.1-25;p.112,ll.15-25). This is another example of how he was treated differently than non-Black employees.

Additionally, Ratliff testified that there were other officers in the K-9 unit who had engaged in more serious incidents than Ratcliff, and were not removed from the unit. (Ptf.depo,p.83,ll.13-19). He cited the example where Sgt. Kerkau's dog bit two Black children for no apparent reason, and Kerkau was not removed from the K-9 unit. (Ptf.depo,p.85,ll.3-9).

**Defendant's Reasons Amounted to Pretext**

Defendant claims to have legitimate business reasons for all of its actions. Plaintiff has established a prima facie case of employment discrimination and has evidence from which the factfinder could find that the employer's proffered reasons for the challenged job actions are pretextual. This entitles the plaintiff to have the factfinder decide the ultimate issue of discrimination. Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519 (11th Cir. 1997). The court must consider all evidence in the light most favorable to the nonmoving party and determine whether

9

reasonable jurors could not have found for the plaintiff based on the evidence in the record.

At the very least, there are numerous factual disputes that warrant denial of summary judgment. A plaintiff is entitled to survive summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons. Id. Once a plaintiff has established a prima facie case and put on sufficient evidence to allow a factfinder to disbelieve an employer's proffered information for its actions, that alone is enough to preclude the entry of summary judgment as a matter of law. Id. Once the court determines that a reasonable jury could conclude that an employer's proffered reasons were not the real reasons for its decision, the court may not pre-empt the jury's role of determining whether to draw an inference of intentional discrimination. Id.

**Comparators Were Similarly Situated**

Ratliff was subjected to discrimination and a hostile environment by fellow employees and supervisors on account of his race. The atmosphere of tolerance of racial slurs and ridicule on a regular basis was allowed by the Police Chief who took no action to stop the hostile environment or discriminatory acts.  The City through Ratliff's numerous complaints to his supervisors was aware or should have been aware of the harassing conduct and failed to take prompt, remedial action. At the very least, this presents a material factual dispute that precludes summary judgment.

Defendant argues that the White employees in the K-9 unit who were not subjected to the same scrutiny and subjected to slurs about their race were nevertheless still not "similarly situated in all material respects" to Ratliff. The Eleventh Circuit has noted that determining the meaning of that phrase is something that must be worked out on a case-by-case basis, in the context of individual circumstance. <u>Lewis v. City of Union City</u>, 918 F.3d 1213 (11th Cir. 2019). The Court pointed to some guideposts in making that determination. A plaintiff does not have to prove that the comparators are identical in all ways other than their race or that they had the same job titles. Minor differences in job duties does not disqualify comparators. The test is whether the comparators were subjected to different employment policies. <u>Id</u>. at 1227.

Similarly situated individuals do not have to be "exactly identical." Furthermore, some conduct may be so unfairly discriminatory that no reasonable person would find it non-actionable. <u>McCann v. Tillman</u>, 526 F.3d 1370 (11th Cir. 2008).

**<u>Hostile Environment</u>**

The facts in the records show that the workplace at the Gainesville Police Department was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions of Ratliff's employment

and create an abusive working environment. *See* Butler v. Alabama DOT, 536 F.3d 1209 (11th Cir. 2008).

At the very least, the issue of whether Ratliff was subjected to a hostile environment that would make a reasonable person voluntarily leave presents a significant material factual dispute. The conditions were so intolerable that Ratliff was forced to quit his job. *See* Davis v. Legal Services of Alabama, Inc., 19 F.4th 1261, 1268 (11th Cir. 2021). Such an environment amounted to a constructive discharge. Whether the continual use of racial slurs was so intolerable that it would drive a reasonable employee to quit is a factual issue for the jury.

A hostile work environment can consist of a series of separate acts that collectively constitute one unlawful employment practice. McCann v. Tillman, 526 F.3d at 1378. A hostile work environment claim addresses acts different in kind whose very nature involves repeated conduct, such as discriminatory intimidation, ridicule and insult. Such claims are based on the cumulative effect of these individual acts.

Plaintiff belongs to a protected group and was subjected to unwelcome harassment based on his race. The harassment occurred over several years and included offensive and demeaning racial slurs. The City and, in particular, the Police Chief, were responsible for allowing this environment to exist.

The actions by the City are not the result of a single action, but rather, a series of events similar to "death by a thousand cuts." The City presents the factual record as a series of independent incidents, each of which it contends is too insignificant to form the basis of an action for discrimination or retaliation. The protection of employees, however, is not limited to those subjected to ultimate employment actions, such as termination. Rather, the law protects employees from being subjected to a series of actions that, viewed cumulatively, would be regarded as materially adverse by a reasonable employee. <u>Moore v. Cricket Communications, Inc.</u>, 764 F.Supp.2d 853, 862 at n.8 (S.D. Tex. 2011).

## **CONCLUSION**

Based on the arguments above, Plaintiff, Ed Ratliff, respectfully asks this Court to DENY Defendant's Dispositive Motion for Summary Judgment.

**[s] Alfred Truesdell**
Alfred Truesdell
Florida Bar No. 885363
Truesdell Law
3521 Tyngsbourgh Drive
DeLand, Florida 32720
(407) 920-7392
truesdelllaw@gmail.com
Attorney for Edward Ratliff

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this Response contains 2,941 words and complies with the Northern District Local Rule 7.1.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 27, 2023, I electronically filed this document electronically through the Northern District CM/ECF filing system to Marc Sugerman, of FordHarrison LLP, attorneys for Defendant, at msugerman@fordharrison.com.

[s] **Alfred Truesdell**
Alfred Truesdell